**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**APPROXIMATELY $4,306,826.95 IN U.S. CURRENCY SEIZED FROM ACCOUNT NO. 1100033166565 AT TRUIST BANK IN THE NAME OF STEEL DISTRIBUTION SERVICES INC;**

**and**

**APPROXIMATELY $60,679.17 IN U.S. CURRENCY SEIZED FROM ACCOUNT NO. 1100033170465 AT TRUIST BANK IN THE NAME OF NAKELLY MEDICAL CENTER CORP.**

**Defendants *In Rem*.**

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through its undersigned counsel, alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(C) and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the Federal Rules of Civil Procedure, to forfeit seized funds, more fully described as (collectively, the "Defendant Assets"):

(i) Approximately[1] $4,306,826.95 in U.S. currency formerly on deposit in account number 1100033166565 held at Truist Bank in the name of Steel Distribution Services Inc. (the "Steel Distribution Account"), which was seized on or about February 13, 2026, to include accrued interest; and

(ii) Approximately $60,679.17 in U.S. currency formerly on deposit in account number 1100033170465 held at Truist Bank in the name of Nakelly Medical Center Corp. (the "Nakelly Account"), which was seized on or about February 13, 2026, to include accrued interest.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3. This Court has *in rem* jurisdiction over the Defendant Assets. *See* 28 U.S.C. §§ 1345, 1355(b).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the Defendant Assets were brought upon seizure. *See* 28 U.S.C. § 1355(b)(1).

## III. FACTUAL ALLEGATIONS

At all times material to this Action:

### A. The Medicare Program and Skin Substitutes

[1] All dates and amounts referenced in this Verified Complaint are approximate.

5. The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to individuals who are 65 years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

7. Individuals who received benefits under Medicare were commonly referred to as "Medicare beneficiaries."

8. Medicare was a "health care benefit program," affecting interstate commerce as defined by 18 U.S.C. § 24(b).

9. Medicare was subdivided into multiple program "parts." Medicare Part B covered, among other things, physician services and outpatient care, including medically necessary skin substitute and skin graft products applied to beneficiaries in non-facility settings, such as a beneficiary's home.

10. Skin substitutes, also referred to as cellular and/or tissue-based products or skin grafts, were products that included amniotic-tissue-based allografts such as Simplimax used to aid in the closure of certain chronic, non-healing wounds, such as diabetic ulcers and pressure ulcers. Medicare reimbursed skin substitute products under product-specific Healthcare Common Procedure Coding System ("HCPCS") codes on a per-square-centimeter basis, together with associated application procedure codes.

11. Health care providers that provided items or services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an enrollment application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the enrolled provider a Medicare provider number.

12. A provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for items and services rendered to Medicare beneficiaries. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement, and were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

13. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company. A Medicare claim for a skin substitute product was required to set forth, among other things, the name and unique Medicare identification number of the beneficiary, the product provided and its size, the date of service, the place of service, the diagnosis, and the identity of the rendering provider.

14. A claim for a skin substitute product submitted to Medicare qualified for reimbursement only if the product was medically necessary for the treatment of the beneficiary's illness or injury, was ordered by a licensed physician or other qualified health care practitioner and was actually provided to the beneficiary as billed.

**B. NAKELLY, STEEL DISTRIBUTION, and the Fraudulent Billing Scheme**

15. As further discussed below, between May and July of 2025, NAKELLY electronically submitted $17,663,992 in fraudulent claims to Medicare as reimbursements for skin substitutes and skin grafts, that were not requested, delivered, or medically necessary for the beneficiaries. Data provided by the Center for Medicare & Medicaid Services ("CMS") shows that between May 2025 and July 2025, Medicare disbursed $7,440,483.46 to the Nakelly Account before the account was voluntarily frozen by Truist. From the Nakelly Account, which was solely funded by Medicare funds during the relevant time period, $6,309,976 was transferred into the Steel Distribution Account. Pursuant to the seizure warrant signed by the Honorable Magistrate Elfenbein, the United States seized $4,306,826.95 in Medicare fraud proceeds from both the Nakelly and the Steel Distribution Accounts.

16. Nakelly Medical Center Corp. ("NAKELLY") was a Florida corporation, with its principal office address in Miami, FL, which is within the Southern District of Florida.

17. Florida Department of State Division of Corporations records reflected that NAKELLY was incorporated on October 25, 2022.

18. According to Florida Department of State Division of Corporations records, on March 19, 2025, NAKELLY's Articles of Incorporation were amended to add Humberto Perez Rodriguez ("PEREZ RODRIGUEZ") as NAKELLY's Vice President with an address in the Southern District of Florida. On April 8, 2025, NAKELLY's Articles of Incorporation were amended once again, to list PEREZ

RODRIGUEZ as NAKELLY's President.

19. Steel Distribution Services Inc. ("STEEL DISTRIBUTION") was a Florida corporation incorporated on or about May 7, 2025 that listed PEREZ RODRIGUEZ as its President.

20. According to Medicare enrollment records, on April 8, 2025, NAKELLY enrolled in Medicare as a Clinic/Practice Group, listing PEREZ RODRIGUEZ as its Authorized Official and identifying the Nakelly Account as the account into which Medicare was to deposit reimbursement payments.

21. As part of its Medicare provider enrollment application, NAKELLY submitted a voided check and an electronic funds transfer ("EFT") Authorization Agreement for the Nakelly Account. The EFT agreement bore a signature purporting to be that of PEREZ RODRIGUEZ as NAKELLY's authorized official.

**C. <u>The Nakelly Account and the Steel Distribution Account</u>**

22. According to bank records obtained from Truist, on March 28, 2025, PEREZ RODRIGUEZ opened the Nakelly Account in NAKELLY's name at Truist Bank, in Miami, FL.

23. According to the signature cards obtained from the bank records, the Nakelly Account's opening documents listed PEREZ RODRIGUEZ as NAKELLY's President and sole authorized signer.

24. According to bank records obtained from Truist, on May 16, 2025, PEREZ RODRIGUEZ opened the Steel Distribution Account in STEEL DISTRIBUTION's name at Truist Bank, in Miami, FL.

25. According to the signature cards obtained from the bank records, Steel

Distribution Account's opening documents listed PEREZ RODRIGUEZ as its President and sole authorized signer.

**D. <u>The Medicare Fraud Scheme</u>**

26. As described further below, from May 2025 through July 2025 — beginning approximately one month after NAKELLY's Medicare enrollment — NAKELLY submitted false and fraudulent claims to Medicare totaling $17,663,992 for skin substitutes and skin grafts that were medically unnecessary.

27. All claims submitted by NAKELLY to Medicare during this period included the same two types of diagnoses: (1) PRESSURE ULCER OF RIGHT HEEL, STAGE 3 and (2) PRESSURE ULCER OF LEFT HIP, STAGE 3.

28. All claims submitted by NAKELLY to Medicare during this period listed Physician 1 as the referring provider.

29. Law enforcement interviewed Physician 1. Physician 1 told law enforcement that at all times relevant to this Complaint, Physician 1: (a) was an accredited plastic surgeon, (b) never heard of NAKELLY, (c) never treated any of NAKELLY's claimed beneficiaries, (d) never prescribed wound skin substitutes, such as Simplimax, for NAKELLY, and (e) never authorized NAKELLY to use his/her NPI for Medicare billing.

30. Law enforcement interviewed five of the Medicare beneficiaries whose Medicare identification numbers PEREZ RODRIGUEZ through NAKELLY, used to bill Medicare.

31. Each interviewed beneficiary stated that he or she was not familiar with NAKELLY, did not receive and did not need the skin substitutes, skin grafts, or

Simplimax, billed to Medicare using his or her Medicare identification number, and was not familiar with Physician 1, who appears in Medicare claims data as the rendering provider on NAKELLY's claims.

**E. <u>The Defendant Assets</u>**

32. The United States obtained bank records for the Nakelly Account, which showed that on July 7, 2025, when Medicare disbursements into the Nakelly Account began, the account had a balance of $364.86.

33. Bank records also showed that between July 7, 2025, through July 21, 2025, as a result of NAKELLY's claims for reimbursement, Medicare deposited a$7,440,483.46 in U.S. currency into the Nakelly Account, as reflected below.

34. These Medicare deposits constituted approximately 99.71% of all deposits into the Nakelly Account, as shown below:

| EFT Check Date | EFT Amount | EFT Trace No. | Deposited Account No. |
|---|---|---|---|
| 7/7/2025 | $141,372.72 | 817234917 | 1100033170465 |
| 7/8/2025 | $373,229.18 | 817234917 | 1100033170465 |
| 7/9/2025 | $229,054.35 | 817234917 | 1100033170465 |
| 7/10/2025 | $698,017.32 | 817234917 | 1100033170465 |
| 7/11/2025 | $1,766,917.33 | 817234917 | 1100033170465 |
| 7/15/2025 | $1,003,423.12 | 817234917 | 1100033170465 |
| 7/16/2025 | $1,308,828.92 | 817234917 | 1100033170465 |
| 7/17/2025 | $610,811.60 | 817234917 | 1100033170465 |
| 7/21/2025 | $1,308,828.92 | 817234917 | 1100033170465 |
| **TOTAL** | **$7,440,483.46** | | |

35. The United States obtained bank records for the Steel Distribution Account, which showed that on July 9, 2025, when transfers of Medicare proceeds

from the Nakelly Account to the Steel Distribution Account began, the Steel Distribution Account had a balance of $144.21.

36. Bank records further showed that beginning on or about July 9, 2025 — two days after the first Medicare deposit — and continuing through on or about July 21, 2025, $6,309,976 in funds traceable to the Medicare deposits were transferred from the Nakelly Account to the Steel Distribution Account.

37. The transfers from the Nakelly Account constituted 100% of all deposits into the Steel Distribution Account from its date of opening on March 28, 2025 through the date of the seizure on February 13, 2026.

38. On July 29, 2025, Truist Bank closed the Nakelly Account and transferred its entire balance of $60,679.17 into a hold harmless account.

39. Similarly, on or about July 29, 2025, Truist Bank closed the Steel Distribution Account and transferred its entire balance of $4,306,826.95 into a hold harmless account.

40. An analysis conducted in accordance with generally accepted accounting principles demonstrated that, as of July 29, 2025, the Nakelly Account's entire balance of $60,679.17 was fully traceable to Medicare reimbursements.

41. An analysis conducted in accordance with generally accepted accounting principles demonstrated that, as of July 29, 2025, the Steel Distribution Account's entire balance of $4,306,826.95 was fully traceable to Medicare reimbursements.

42. On or about February 18, 2026, law enforcement agents served a federal seizure warrant on Truist Bank for the balance of the Nakelly Account and the Steel

Distribution Account. *See* Case Nos. 26-MJ-02321-ELFENBEIN; 26-MJ-02322-ELFENBEIN (S.D. Fla.).

43. Pursuant to those seizure warrants, Truist Bank remitted to the Federal Bureau of Investigation ("FBI") $4,306,826.95 in U.S. currency from the Steel Distribution Account and $60,679.17 in U.S. currency from the Nakelly Account.

44. In total, the FBI seized $4,367,506.12 in U.S. currency (collectively, the "Defendant Assets").

## IV. BASIS FOR FORFEITURE

45. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such offense is subject to civil forfeiture.

46. Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

47. Pursuant to 18 U.S.C. § 1347, health care fraud is a "Federal health care offense."

### FIRST CLAIM
**Proceeds of Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

48. The factual allegations in paragraphs 1 through 47 are re-alleged and incorporated by reference as if fully set forth herein.

49. As set forth above, the Defendant Assets are property that constitute or are derived from proceeds traceable to health care fraud in violation of 18 U.S.C.

§ 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

50. Accordingly, the Defendant Assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, Plaintiff, the United States of America, requests that the Clerk of the Court issue a warrant for the arrest *in rem* of the Defendant Assets; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Assets; that the Defendant Assets be forfeited and condemned to the United States of America; and for such other and further relief as may be deemed just, necessary and proper.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Sandra Demirci*

Sandra Demirci (Court ID A5503244)
Assistant United States Attorney
500 East Broward Boulevard
Fort Lauderdale, FL 33394
Telephone: (954) 660-5959
Facsimile: (305) 536-7599
E-mail: sandra.demirci@usdoj.gov
*Counsel for United States of America*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Alexandria Davis, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation and that I have read the foregoing Verified Complaint for Forfeiture In Rem and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement agents, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

Executed on this 18th of June 2026.

Alexandria Davis, Special Agent,
Federal Bureau of Investigation